Glenn H. Morton and Myrtle R. Morton v. Commissioner.
Morton v. Commissioner
Docket No. 5165-68.
United States Tax Court
T.C. Memo 1971-156; 1971 Tax Ct. Memo LEXIS 175; 30 T.C.M. (CCH) 671; T.C.M. (RIA) 71156; June 30, 1971, Filed *175 1. Held, Petitioner-husband, a physician practicing as an anesthesiologist may not deduct as business expenses the costs of traveling between his residence and a hospital in response to emergency calls. The amounts claimed constituted personal commuting expenses which are nondeductible, and the fact that his occupation required more than one trip a day between his home and place of work does not alter this conclusion. 2. Held further, petitioners were not engaging in horse breeding, raising, and training with a bona fide profit expectation, and consequently the expenses connected therewith are not deductible. 672 Robert O. Rogers, 400 *176 Bldg., 400 Royal Palm Way, Palm Beach, Fla., for the petitioners. Glenn Gilson, for the respondent. STERRETT
STERRETT, Judge: Respondent determined deficiencies of $830.21 and $709.90 in petitioners' income taxes for the taxable years 1964 and 1965 respectively. Due to concessions by petitioners, only one of the adjustments made in the statutory notice remains for our decision. That adjustment raises the question of whether certain automobile expenses are deductible by petitioners as ordinary and necessary business expenses under section 162. [1] Because petitioners claim overpayments for both years in issue, an additional question is raised with respect to whether certain expenses incurred by petitioners in the breeding, raising and training of horses are deductible. Findings of Fact Dr. Glenn H. Morton (hereinafter referred to as Dr. Morton) and Myrtle R. Morton (hereinafter collectively referred to as petitioners) are husband and wife. They resided in Riviera Beach, Florida, at the time of filing their petition herein, and filed their joint Federal income tax returns for the taxable *177 years 1964 and 1965 with the district director of internal revenue, Jacksonville, Florida. During the years in issue Dr. Morton was engaged in the practice of medicine, specializing in anesthesiology. He was a member of a partnership comprised of five individuals and known as Anesthesiology Associates. The partnership maintained a business office in West Palm Beach, Florida. The office was used for secretarial work and billings and collections. No medicine was practiced in the office. The partnership, during the years in issue, had a verbal arrangement with the Good Samaritan Hospital, West Palm Beach, Florida (hereinafter referred to as the hospital), to have an anesthesiologist available to the hospital on a 24-hour basis. During a normal working week, Dr. Morton would go to the hospital at 7:30 or 8:00 a.m. to assist with operations that had been scheduled for the day. The schedule would usually be completed by 3:00 p.m. Dr. Morton was on duty for emergencies approximately 2 days per week, and every other weekend. When on emergency duty, Dr. Morton would normally go home after the completion of the scheduled operations and have supper. He would then return to the hospital to *178 make rounds at 5:00 p.m., and if nothing was pending would return to his home until called for an emergency. During the years in issue, Dr. Morton averaged two to four emergency calls per night when on duty. Dr. Morton returned home between emergency calls. While at home in between emergencies Dr. Morton would eat, sleep, and attend to other personal functions. No sleeping facilities were available at the hospital for Dr. Morton's use when he was on emergency call. Dr. Morton did not have any significant medical practice at his residence. In 1964 Dr. Morton incurred automobile expenses, including depreciation and operating costs, in the total amount of $2,423.43. Dr. Morton's total automobile expenses for 1965 were $2,217.36. During 1964 and 1965 Dr. Morton drove his automobile 12,297.2 and 14,385.9 miles respectively. The parties have stipulated that Dr. Morton's automobile expenses were incurred ratably with each mile driven. Out of the total mileage driven by Dr. Morton in each year, respondent, in the statutory notice of deficiency, allowed a deduction for the costs of 2,943.2 miles of travel in 1964 and 2,967.9 miles in 1965 as incurred for business purposes. Petitioners have *179 conceded that Dr. Morton drove his car for personal reasons a total of 4,170 miles in 1964 and 4,290 miles in 1965. Included in this personal travel is 2,970 miles per year for daily round trips between Dr. Morton's residence and first place of business each working day. The balance of the mileage driven by Dr. Morton amounts to 5,184 miles in 1964 and 7,128 miles in 1965. This travel is attributable to second and subsequent round trips each working day between Dr. Morton's residence and a hospital. A great majority of these trips were between Dr. Morton's residence and Good Samaritan Hospital. Ninety percent of the trips were in response to emergency calls and 10 percent were for making rounds or visiting patients. In their 1964 and 1965 income tax returns petitioners deducted substantially all Dr. Morton's automobile expenses for those 673 years. Other than the conceded amounts of mileage set out above, respondent, in a statutory notice of deficiency dated August 8, 1968, disallowed Dr. Morton's claimed transportation expenses for the asserted reason that "[it] has not been established * * * [the claimed amounts] represented an ordinary and necessary expense of your business. *180 " Prior to 1964 Dr. Morton was looking for a business he might enter upon his retirement from the practice of medicine. Dr. Morton is a graduate of Syracuse Forestry College, where he majored in zoology and big game management. He also spent a year at Cornell University in the Veterinarian College and 4 years with the State of New York managing its big game program which primarily concerned the grazing and breeding of white-tailed deer. Dr. Morton felt this background gave him some knowledge of horse raising. However he had no knowledge of how much capital would be required to profitably operate a horse breeding and training business. From 1962 through the years in issue, petitioners owned at one time or another a total of six horses. In 1960, petitioners visited a working ranch in Sheridan, Wyoming, where they spent 2 weeks inquiring about the ranch's breeding and training program, method of sale, and other matters incidental to raising horses for profit. Returning to West Palm Beach, Florida, petitioners spoke to trainers and breeders in the area. They also bought many books and studied the various breeds of horses to determine which would be the most profitable. Upon the basis *181 of their investigation they decided that the American Saddle horse offered the best prospects for deriving a profit. After reaching this conclusion petitioners traveled to Kentucky and further investigated possibilities with 12 major breeders in that state. On August 6, 1963, petitioners bought a registered, untrained, 3-year old, American Saddle breed mare named Firefly for $3,000. Dr. Morton was told at the time of this purchase that trained mares of the American Saddle breed type were selling in Kentucky for prices between $4,000 and $20,000, with an average of $8,000 or $10,000. However, Dr. Morton has never attended any horse auctions. With an increase in the number of horse show entries in the American Saddle horse class, petitioners concluded that the demand for that type of horse in south Florida was expanding. After purchasing Firefly, petitioners brought her to Florida and turned her over to a trainer who entered her in shows. The value of a horse increases as it enters shows and wins ribbons and trophies. Some of petitioners' horses did win prizes, none of which were monetary. Dr. Morton did not personally train Firefly. The American Saddle breed is a five-gaited horse, *182 and Dr. Morton is untrained to ride such a horse. Petitioners eventually developed the opinion that the demand for American Saddle horses in south Florida had begun to wane. About that time petitioners decided to sell Firefly for $5,000. One offer for $4,000 was received, but negotiations were terminated because the prospective purchaser could not complete the deal. The availability of Firefly was not formally advertised, rather this fact was mentioned to persons petitioners met at horse shows. Firefly is still owned by petitioners. A registered American Saddle breed stud colt named Tamilor's Rex was purchased by petitioners on October 15, 1963 for $100. The horse was sold for this low price because he had been injured a few days after birth and could not be used for showing. However, the horse had excellent breeding and Dr. Morton believed he could be used for stud purposes. Petitioners, on January 25, 1962, acquired for pleasure use a horse named Baby Doll. In 1964 they bred her and she bore a colt named Corky on April 17, 1965. Corky was sold at a loss on March 11, 1968, for $400. Aside from the first few months of his life when he was nursing, Corky cost $30 per month to *183 feed. Baby Doll was the first horse petitioners acquired. Petitioners still own Baby Doll. Prior to the years in question the petitioners had also purchased a mare named Champ for use by their daughter as a riding horse. Champ was given to an organization known as Boys Ranch about a year after the horse was acquired. Petitioners also owned another horse named Daisy which was sold in 1962. Petitioners were very fond of horses and rode for pleasure. During the years in issue Dr. Morton was a member of the Sheriff's Mounted Posse of Palm Beach County. The Posse had a search and rescue function, maintained a showground, and participated in local parades. Dr. Morton did not ride his own horse in the Posse. During the years in issue Firefly, Rex, Baby Doll and Corky were boarded at a stable owned by an unrelated party because 674 petitioners did not own a farm, ranch, or stable. Petitioners did not claim any deductions for the expenses in connection with the horses on their returns for 1964 and 1965. They did not prepare any books of account or schedules for the horses until after the Internal Revenue Service began an audit of the returns for the years in issue. Dr. Morton did *184 not claim deductions for the horse raising activity because he did not want to be subject to audit on the matter before he could ascertain whether the effort could be profitable. The parties agree that petitioners incurred expenses of $3,329.41 in 1964 and $3,280.77 in 1965 for the training, care, maintenance, depreciation and equipping of the horses. In their petition, petitioners claimed they are entitled to deduct the above amounts as losses "* * * sustained in their trade or business of farming." Petitioners thus claim an overpayment. Opinion The first question we are to consider is whether the costs incurred by Dr. Morton in driving from his residence to the hospital and back again when responding to emergency calls or making the rounds visiting patients are deductible as ordinary and necessary business expenses. [2] We hold that they are not so deductible. It has long been held that the costs of traveling from one's residence to one's place of *185 work and back again are commuting expenses and thus not incurred in carrying on one's trade or business. , affirmed per curiam (C.A. 5, 1960), and cases cited therein. The facts concerning this issue reduce to one relevant feature. The travel expenses in question were incurred by Dr. Morton in going between his residence and a place of employment. Dr. Morton admittedly did not practice medicine at his residence to any significant degree. Consequently the expenses in question were incurred for commuting and are of a nondeductible personal nature. That Dr. Morton's particular occupation may have resulted in his making more than one trip between his home and place of work during a 24-hour period does not alter this fact of life. See ; . Now we turn to the question of whether the losses petitioners sustained on their horses in 1964 and 1965 are deductible from income. For the expenses to be deductible under any relevant provision of the Internal Revenue Code of 1954, [3] petitioners must have undertaken *186 their horse breeding, raising and training activities for the purpose of earning a profit. The petitioners must be able to show that they had a bona fide expectation of realizing a profit. The profit expectation, however, need not be a reasonable one. The question is a factual one, and is determined upon the record in each case. , affirmed (C.A. 2, 1967). Whether petitioners had a bona fide profit expectation is shown by their overt actions in the situation and the results actually produced. Upon a consideration of all the evidence, we conclude that petitioners were not engaged in their horse breeding, raising and training activities in 1964 and 1965 with the bona fide expectation of making a profit. *187 Presumably an individual who was engaging in an activity for profit would order his affairs with that objective in mind. In this regard petitioners' conduct is somewhat deficient. While Dr. Morton was informed as to the technicalities of breeding horses, he admitted to having no knowledge 675 concerning the capital outlay needed to support a horse breeding operation. Most significantly, petitioners did not keep books and records of account, which would not only enable them to accurately record income and disbursements, but also control expenditures with an eye toward reducing losses and eventually turning a profit. The record is devoid of any indication that petitioners advertised or held themselves out to others as horse breeders and trainers. Dr. Morton testified that he did not deduct the expenses of petitioners' equestrian activities on their 1964 and 1965 returns because he wanted to see first if a profit could be made on the operation. This indicates that petitioners entertained more than some doubt as to whether their efforts would generate any profit. When petitioners in 1963 purchased an untrained, registered American Saddle breed mare in Kentucky, they were told that *188 such a horse, when trained, could be sold for a substantial price in Kentucky. Dr. Morton testified that he brought the horse from Kentucky to Florida for the purpose of training and showing it and then selling it to make a profit. It does not appear that petitioners seriously investigated the market for this type of horse in south Florida where they resided and apparently showed the horse. Dr. Morton testified that he felt the demand for American Saddle horses was increasing in south Florida because more of them were being entered in shows. However there is no indication that petitioners were aware of what price a trained American Saddle horse would fetch in south Florida and how such price compared to the costs of training and maintaining the horse until time of sale. Petitioners' breeding program only produced one horse. This horse was sold 35 months after birth for $400, producing a loss. The cost alone of feeding this horse was $30 per month, and certainly other expenses must have been incurred. This is an additional indication that a profit was not expected from the operation. Petitioners did not own any facilities where the breeding and training of horses could be conducted. *189 Rather their horses were boarded out and trainer hired. There is no showing that petitioners devoted much time to their horse breeding and training activities. Indeed, the demands of Dr. Morton's professional duties would appear to have left him little time for such activities, especially since the horses were not located in the area of his residence. Both Dr. Morton and his wife are fond of horses and enjoy riding. Three of the horses purchased by petitioners between 1962 and 1968 were acquired, initially at least, for the purpose of pleasure riding. Dr. Morton also participated for several years in the Sheriff's Mounted Posse of Palm Beach County. Thus it is clear that petitioners for some time had a hobby interest in horses. This indicates that their breeding and training activities may have been merely an extension of their hobby interest. It is clear that petitioners did make a general investigation of the possibilities of breeding horses for profit. In our opinion, however, the record does not establish that petitioners got beyond the exploratory and investigative stage of any plan to establish such a business. Cf. . *190 Having concluded that petitioners' activities with respect to their horses in 1964 and 1965 were not pursued with a bona fide profit expectation, we hold that the expenses incurred in those activities are personal expenses, nondeductible under section 262. [4]
Decision will be entered for the respondent. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. Fn. 2, supra. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. -in the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * *.↩
4. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses.↩